IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 14, 2019 Session

## TENNESSEANS FOR SENSIBLE ELECTION LAWS v. TENNESSEE BUREAU OF ETHICS AND CAMPAIGN FINANCE, REGISTRY OF ELECTION FINANCE, AND DAVIDSON COUNTY DISTRICT ATTORNEY GENERAL

**Appeal from the Chancery Court for Davidson County**
**No. 18-821-III      Ellen H. Lyle, Chancellor**

———————————————————

**No. M2018-01967-COA-R3-CV**

———————————————————

This appeal involves a constitutional challenge to two Tennessee statutes that are part of Tennessee's campaign finance law. Prior to trial, the chancery court granted several motions in limine that effectively excluded all of the testimonial and documentary evidence proffered by the State in defense of the statutes. With no evidence presented by the State, the trial court concluded that the State failed to meet its burden of proof as to the constitutionality of the two statutes. Consequently, the trial court held that Tennessee Code Annotated sections 2-10-117 and 2-10-121 violate the First and Fourteenth Amendments to the United States Constitution and Article I, section 19 of the Tennessee Constitution. The State appeals. The State first argues that the trial court abused its discretion by excluding the State's evidence. Additionally, the State argues that the constitutional challenge to one of the statutes has become moot due to a statutory amendment. Finally, the State argues that the remaining statute is constitutional. For the following reasons, we affirm and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; Janet M. Kleinfelter, Deputy Attorney General; Matthew F. Jones, Assistant Attorney General; and Kelley L. Groover, Assistant Attorney General, for the appellant, Tennessee Bureau of Ethics and Campaign Finance, Registry of Election Finance.

Daniel A. Horwitz and Jamie R. Hollin, Nashville, Tennessee, for the appellee, Tennesseans for Sensible Election Laws.

Braden H. Boucek, Nashville, Tennessee, for the Amicus Curiae, Beacon Center of Tennessee.

Brian Kelsey, Chicago, Illinois, and Jacob Huebert, *pro hac vice*, Phoenix, Arizona, for the Amici Curiae, Liberty Justice Center and Goldwater Institute.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Tennesseans for Sensible Election Laws ("TSEL") describes itself as a nonpartisan nonprofit group that engages in substantial advocacy efforts regarding election related issues in Tennessee. To further its objectives, TSEL makes direct monetary contributions to state and local candidates for public office across the State of Tennessee. During 2018, TSEL expended over $3,000 on direct campaign contributions and election expenditures for and against various candidates and measures.

Because of this political activity, TSEL must comply with Tennessee's "Campaign Financial Disclosure Act of 1980," Tenn. Code Ann. § 2-10-101, *et seq*., in addition to the "Campaign Contribution Limits Act of 1995," Tenn. Code Ann. § 2-10-301, *et seq*.[1] Under these Acts, any group that "receives contributions or makes expenditures to support or oppose any candidate for public office or measure during a calendar year in an aggregate amount exceeding one thousand dollars ($1,000)" meets the definition of a "political campaign committee." Tenn. Code Ann. § 2-10-102(12)(B). There are several types of political campaign committees, including multicandidate political campaign committees, single-candidate political campaign committees, and single-measure political campaign committees. Tenn. Comp. R. & Regs. 0530-01-01-.01(5). TSEL meets the definition of a "[m]ulticandidate political campaign committee" because it is "a political campaign committee to support or oppose two (2) or more candidates for public office or two (2) or more measures."[2] Tenn. Code Ann. § 2-10-102(9).

On July 26, 2018, TSEL filed a verified complaint for injunctive and declaratory relief in the chancery court of Davidson County, challenging the constitutionality of two statutes applicable to multicandidate political campaign committees. TSEL alleged that it

---

[1] The Tennessee Bureau of Ethics and Campaign Finance, Registry of Election Finance ("the Registry"), is an agency of the State of Tennessee responsible for administering and enforcing both of these Acts. *See* Tenn. Code Ann. § 2-10-101(d); Tenn. Code Ann. § 2-10-301(b).

[2] The parties agree that multicandidate political campaign committees are commonly known as PACs.

had endorsed a certain candidate for state representative and desired to make an immediate contribution of $500 to his campaign prior to the upcoming competitive primary election on August 2, but it was prevented from doing so by Tennessee Code Annotated section 2-10-117, which provides:

> No multicandidate political campaign committee other than a committee controlled by a political party on the national, state, or local level or by a caucus of such political party established by members of either house of the general assembly shall make a contribution to any candidate after the tenth day before an election until the day of the election.

TSEL alleged that its proposed contribution would be illegal because it is a *nonpartisan* multicandidate political campaign committee, while a *partisan* or party-controlled political campaign committee would be permitted to contribute under the exception provided in the statute. TSEL claimed that a violation of the statute could subject it to criminal prosecution with a sentence of up to thirty days and/or a civil penalty up to $10,000. *See* Tenn. Code Ann. §§ 2-19-102, 40-35-111(e)(3), 2-10-110(a)(2).

TSEL sought a preliminary injunction prohibiting the State (through the Registry and/or the District Attorney General) "from prosecuting [it] either criminally or civilly" for contributing to the aforementioned candidate. TSEL also sought a declaratory judgment and a permanent injunction prohibiting enforcement of the statute on the basis that it was unconstitutional "for multiple reasons." TSEL alleged that the statute contained an impermissible speaker preference, permitting only groups controlled by political parties or caucuses to contribute during the final ten-day period, discriminating on the basis of identity and political affiliation. TSEL asserted that the statute imposed a content-based restriction on disfavored political speech and association. It also alleged that this blanket ban on political speech during the most critical phase of an election was a severe burden that was not sufficiently tailored to a compelling state interest. TSEL claimed that the ten-day blackout period had not only prevented it from making contributions but also caused it to make contributions at such an early stage that it was not advantageous, as one candidate it supported had withdrawn from the race prior to the election and another returned a mailed donation because it was not received before the blackout period began.

Additionally, TSEL alleged that Tennessee Code Annotated section 2-10-121 was unconstitutional, because, at the time, it imposed a $100 annual fee exclusively on nonpartisan multicandidate political action committees:

> No later than January 31 of each year, each multicandidate political campaign committee registered with the registry of election finance shall pay a registration fee to be determined by rule promulgated pursuant to § 4-55-103(1). . . . All fees collected under this section shall be retained and

- 3 -

used for expenses related to maintaining an electronic filing system.  This section shall not apply to any statewide political party as defined in § 2-1-104 or subsidiaries of the political party.

Tenn. Code Ann. § 2-10-121 (2018).  TSEL emphasized that the fee is assessed exclusively against *nonpartisan multicandidate* political campaign committees, but not party-controlled political campaign committees or individual contributors.  It alleged that this assessment against "disfavored political speakers" was unconstitutional, as it expressly discriminated based on political association, charging only "disfavored non-party political speakers" the $100 fee while charging partisan speakers nothing.  TSEL asserted that section 121 was unconstitutional both facially and as applied because it discriminated on the basis of political association by exempting *both* political parties *and* individual political speakers.  It sought a declaratory judgment and a permanent injunction prohibiting enforcement of section 121.

In summary, TSEL asserted that Tennessee Code Annotated sections 2-10-117 and -121 were unconstitutional, both facially and as applied, violating the First and Fourteenth Amendments to the United States Constitution and Article I section 19 of the Tennessee Constitution.  Along with the filing of its complaint, TSEL also filed a motion for preliminary injunction.  "Barring objection from Defendants," TSEL moved that the trial on the merits be advanced and consolidated with the preliminary injunction hearing pursuant to Tennessee Rule of Civil Procedure 65.04(7).[3]

The Attorney General and Reporter for the State of Tennessee filed a response on behalf of the Registry and District Attorney General.  The State asserted that the General Assembly added Tennessee Code Annotated section 2-10-117 and its contribution ban to the statutory scheme in 1995 as part of its effort to place limits on campaign contributions and expand reporting requirements.  *See* 1995 Pub. Acts, c. 531, § 10, eff. Jan. 1, 1996, "Campaign Contribution Limits Act of 1995."  The State explained that political campaign committees are required to file disclosure reports detailing their contributions to candidates pursuant to Tennessee Code Annotated section 2-10-105(c) and (d).  These disclosure reports are due at various intervals, and one particular pre-election report is due seven days before an election.  Tenn. Code Ann. § 2-10-105(c)(1).  The pre-election report must detail contributions "through the tenth day" before the election.  *Id.*  Thus, the State argued that the contribution ban in section 117 was "directly tied to" the pre-election disclosure statements and "a crucial part of the disclosure scheme."  It suggested that the statute utilized the "smallest possible window" to ensure full disclosure.[4]  The

---

[3] Rule 65.04(7) provides, in pertinent part, "**Consolidation of Hearing with Trial on Merits.** Before or after the commencement of the hearing of an application for a preliminary injunction, the Court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application."

[4] We note that the State has consistently referred to the contribution ban as a nine-day blackout period, while TSEL has referred to it as a ten-day blackout period.

State asserted that section 2-10-117 serves the State's interests in "ensuring a fully informed electorate and preventing corruption or its appearance." According to the State, if multicandidate political campaign committees were permitted to contribute during the final days of the campaign, such contributions would not be disclosed to the public until after the election, when the information was no longer useful to voters. The State also suggested that it was unnecessary to ban contributions from political campaign committees controlled by political parties or caucuses because it was "intuitive and self-evident" that those committees would be contributing to their respective party candidates.

The response filed by the State Defendants did not address TSEL's request for consolidation of the hearing with the trial on the merits. A hearing was held on July 31, 2018. The next day, the trial court entered an order denying the application for a temporary injunction but providing that a final decision would be rendered on the merits within thirty days. According to the trial court's order, the court deemed it inappropriate to issue a preliminary injunction with only two days remaining before the primary election because other nonpartisan political campaign committees similar to TSEL would not have time to seek relief before the court, and TSEL would have an advantage in the August 2 primary that no other nonpartisan political campaign committee would have. However, noting TSEL's previous request for the case to be decided promptly, the order provided that the trial court would issue a final order on the merits by September 5, 2018 (prior to the upcoming general election in November). The order stated, "This disposition of the case has been consented to by Counsel who agree the issues are matters of law and that an evidentiary record is not necessary."

On August 24, 2018, the trial court *sua sponte* entered a revised order scheduling "a trial on limited fact issues." The trial court noted its previous order provided for a ruling by September 5, as TSEL had sought a "speedy" ruling before the November election. However, the trial court explained that in studying and researching in preparation for its ruling, the court had determined that "an evidentiary record on limited issues is needed to inform the questions of law." Because the statutes at issue restrict speech, the court explained, the State would bear the burden of proof as to the constitutionality of the statutes. *See McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 210 (2014) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.") (internal quotation omitted). The trial court explained that under prevailing caselaw, that burden could not be met by "mere conjecture" regarding the governmental interests at stake. *Id.* ("[W]e have never accepted mere conjecture as adequate to carry a First Amendment burden[.]") (quotation omitted).

Because the record before the trial court did not contain the necessary factual proof, the trial court determined that it was unable to decide the matter on the present record and that a brief trial on limited issues was needed. The August 24 revised order proposed an "expedited schedule" with specific deadlines. By September 12, the State

- 5 -

was required to file its answer to the complaint along with "a list of exhibits and witnesses" it expected to introduce at trial. By September 19, TSEL was required to file its list of rebuttal exhibits and witnesses. On September 26, the bench trial would be held on the limited issues requiring evidentiary proof. Lastly, the trial court noted that it was the court's impression from the last hearing that "both parties, in consenting to have the entire case decided on the temporary injunction record alone, wanted this matter decided in an expeditious manner." Because the trial court had proposed a different schedule, the trial court recognized that the parties "may have a different perspective as to the timing and disposition of this case." The order provided that if either party desired to seek a modification of the trial court's proposed expedited schedule, it must file a "Notice" by Friday, August 31, stating its position as to the timing and/or disposition of the case and any relief requested.

Thereafter, TSEL filed such a Notice, seeking modification of the revised order. TSEL argued that the State had taken a "binding litigation position" at the original hearing regarding its intention not to present evidence. TSEL argued that this constituted a formal voluntary waiver of its right to present evidence, recognized by the trial court's original order, and therefore, the trial court should not relieve the State of that decision *sua sponte*. TSEL asked the court to reinstate the original order and decide the matter without additional evidence.

The trial court ordered the State to respond to TSEL's Notice. In its response, the State argued that the position it took at the injunction hearing did not constitute a judicial admission amounting to a waiver of its right to present evidence. The State asserted that it was "fully prepared to go forward with the proposed schedule set forth in the August 24, 2018 [revised] Order."

On September 4, the trial court entered an order denying TSEL's "Notice" requesting reinstatement of the original order and confirming the trial date of September 26. The trial court reiterated its belief that "if it were to proceed to rule on the merits of this lawsuit without an evidentiary record, it would be a clear error of law that would require a remand by the Court of Appeals." The court restated its original deadline of September 14 for the State to file its answer and list of exhibits and witnesses and directed it to include "a brief description as to what the Defendants expect the witnesses will testify about at trial." The order stated the court's assumption that no depositions would be taken given the expedited nature of the proceeding. However, it also stated that if TSEL determined that depositions were needed once it received the list of exhibits and witnesses the State intended to present at trial, the above schedule would have to be adjusted to allow additional time for discovery. TSEL was again directed to file its list of exhibits and witnesses by September 21, with a brief description of their expected testimony.

On the September 14 deadline for the State, it filed its answer as instructed along

- 6 -

with a "List of Exhibits and Witnesses." The List stated:

> a. Witnesses Defendants expect to present:
> 1) Drew Rawlins, Executive Director of the Tennessee Bureau of Ethics and Campaign Finance[.]

The List did not contain any description of what the State expected Mr. Rawlins to testify about at trial, as required by the prior order. As for exhibits, the List included 24 exhibits the State expected to present at trial. The first six were affidavits of various individuals who were listed by name and title, similar to the designation of Mr. Rawlins above, with no description of the content of the affidavits. For Exhibits 7 through 24, the list contained titles of articles from newspapers and other publications dating back to 1992, "Legislative history from 99th Session of the Tennessee General Assembly for House Bill 89 and Senate Bill 79," one particular candidate's "Campaign Financial Disclosure Reports" from 1992, and "Broadband Internet Deployment, Availability, and Adoption in Tennessee, Tenn. Advisory Comm'n on Intergovernmental Relations (2017)."

One week later, on September 21, TSEL filed its witness and exhibit list as directed by the prior order. As for witnesses, TSEL listed "[a]ny witnesses called by Defendants, if necessary[.]" It also listed two exhibits. However, TSEL contemporaneously filed three motions in limine seeking to exclude the testimony of the State's sole witness along with the State's listed exhibits. The first motion in limine addressed the sole witness. TSEL sought an order precluding the State from calling Drew Rawlins as a witness at trial because its witness list did not include the required description of his testimony. The second motion in limine sought exclusion of the State's proposed exhibits one through six, which were described as affidavits of various individuals. TSEL again noted that the trial court's order required the State to describe the substance of its witnesses' expected testimony. TSEL argued that the State had attempted to circumvent that requirement by proposing to have six witnesses testify by affidavit. TSEL argued that the affidavits constituted inadmissible hearsay pursuant to Tennessee Rule of Evidence 801(c) and should not be admitted because doing so would deprive it of the opportunity to cross-examine the witnesses. Finally, in the third motion in limine, TSEL sought exclusion of the remaining exhibits, spanning from number seven to number twenty-four. TSEL argued that some of these exhibits were inadequately described, but in any event, they should all be excluded as conditionally irrelevant pursuant to Tennessee Rule of Evidence 104(b). TSEL asserted that none of the remaining exhibits were relevant if the State could not first demonstrate that the statutes were narrowly tailored to achieve the interests it asserted.

On Monday, September 24, 2018, the trial court entered an order scheduling oral argument on the three motions in limine for 9:00 a.m. on September 26, the morning of the scheduled bench trial. Also on Monday September 24, late that afternoon, counsel for TSEL sent the following email to the three attorneys of record for the State:

[Subject:] **Local Rule 29.01 Exchange of Exhibits**[5]

Generals,

We look forward to seeing you all on Wednesday morning.

Local Rule 29.01(b) contemplates the exchange of exhibits at least 72 hours before trial.  You already have ours, so we'd be grateful if you'd send us yours at your earliest convenience, since we don't have any of them.

We appreciate your time.

When counsel received no response to his email by noon the next day, which was less than twenty-four hours before the trial would begin, he filed a fourth motion in limine, seeking to exclude all of the State's exhibits (1-24) on the basis that they were not exchanged prior to trial in accordance with the local rule.

The hearing commenced the following morning.  At the outset, the trial judge considered the four motions in limine filed by TSEL.  Counsel for TSEL reiterated the bases for the four motions and stated that the requested exhibits were finally received the previous afternoon around 2:00 or 2:30 p.m.  The trial judge discussed the possibility of continuing the hearing, but at the same time, the trial judge noted that a continuance would result in the hearing being held after the upcoming November election.  She noted that both parties had agreed to have an expedited hearing before the election.  Instead of a continuance, counsel for TSEL asked the trial judge to proceed with consideration of the motions in limine and to grant the motions, excluding the State's evidence and "restor[ing] them to the position that they previously took, which is that they don't need evidence and they don't have to introduce evidence[.]"

The trial judge then proceeded to hear from counsel for the State.  With respect to

---

[5] The Davidson County Local Rules of Practice provide:

§ 29.01. Required Exchange of Witnesses and Documents

      At least seventy-two (72) hours (excluding weekends and holidays) before the trial of a civil case, opposing counsel shall either meet face-to-face or shall hold a telephone conference for the following purposes:
          a. to exchange names of witnesses, including addresses and home and business telephone numbers (if not included in interrogatory answers) including anticipated impeachment or rebuttal witnesses; and
          b. to make available for viewing and to discuss proposed exhibits.
In the event that the parties hold a telephone conference rather than a face-to-face meeting, the exhibits shall be made available for viewing before the conference.

the first motion in limine, regarding the lack of any description of the witness testimony, counsel noted that Mr. Rawlins was identified by his title of "Executive Director" of the Registry, and she suggested that it should have been "pretty obvious as to what he was going to testify is the actions of the Registry of Election Finance."

With regard to the second motion in limine, addressing the affidavits listed as exhibits one through six, counsel for the State stated that "because of the expedited basis of this trial, there was no way that we could have these witnesses available today." She explained that some of the witnesses were located more than 100 miles away, and at least two were "extremely busy at this moment preparing for the November elections." Counsel explained that she was unable to ensure that the witnesses would be available for the trial date, and she suggested that TSEL could have requested a continuance if it desired to depose these witnesses.

As for the third motion in limine, regarding conditional irrelevance, counsel simply argued that the exhibits were adequately described and that "it's the Court that decides whether or not a particular exhibit is relevant, not opposing counsel." She argued that even if it was the State's burden to demonstrate narrow tailoring, the evidence would be necessary for that purpose.

Finally, concerning the fourth motion in limine, counsel stated that the documentary exhibits from its list were "public records" that could have been obtained from the internet or from "the State library and archives." She suggested that it was simply impossible to exchange the affidavits by the deadline because "we were still in the process of getting executed affidavits, and two of the affidavits were not actually executed until yesterday."

At the conclusion of oral argument, the trial judge orally announced that she was granting all four motions in limine for the reasons set forth by TSEL. She explained,

> [T]he State failed to comply with measures that this Court had put in its order to regulate and provide structure and fair notice when we were having a bench trial on an expedited basis.
> The Court was careful and thoughtful in crafting regulations so that the trial of this case would be fair, even though it was expedited, and the State has not complied with the Court's order. The State did not provide a description of the testimony that would be given by its witness.
> The Court had also put in footnote 1 of its order that if there were difficulties or problems complying with the deadlines, that relief should be sought from the Court, and the Court anticipated or acknowledged that that was a possibility. The State never came forward and asked for any additional time or measures in which to put their evidence on before the Court, other than the limited bench trial that the Court had set up. These

are in addition to the reasons that are stated by the plaintiff in their oral argument and their briefing.

The Court concludes that the way that the State has proceeded, it has the effect of a trial by ambush, and it doesn't provide an opportunity for the other side to defend against the proof that the plaintiff seeks -- that the defendant, the State, seeks to offer.

The trial judge then announced that "having granted the motions in limine, the State has insufficient facts of record to withstand the plaintiff's claim, and so judgment is granted in favor of the plaintiff[.]" However, the trial judge permitted the State to make an offer of proof, introducing its twenty-four exhibits for identification only and examining its only witness outside the presence of the judge.

The trial court entered a written order on October 11, 2018. The order states that the trial court convened a limited bench trial in order to provide the State an opportunity to present evidence in defense of the constitutionality of the restrictions on speech found in Tennessee Code Annotated section 2-10-117 and -121. However, the order added, "the State Defendants [] inexplicably failed to comply with orders to give the Plaintiff fair notice of Defendants' proof." The trial court found that the State did not comply with the court's order or the local rules of court, as it failed to provide a description of the testimony that would be given by its witness, and it did not timely provide its trial exhibits to TSEL. The order repeated the trial judge's observation that the State's course of action had "the effect of a trial by ambush, and it does not provide a fair opportunity for the Plaintiff to defend against the proof that the Defendants seek to offer."

The order acknowledged that normally a continuance and possible sanction of attorney's fees would have been an appropriate option but explained that "a continuance was not possible in this case." The order noted that the State had consented to an expedited bench trial due to the upcoming November 6, 2018 election. The court also noted that the State had announced at the first hearing in this case that it "would not and did not need to present evidence in this matter," and at that time, "the parties mutually agreed to submit this case for immediate decision on the merits without additional evidence beyond the exhibits introduced into the record by the parties in advance of the July 31, 2018 hearing." The trial court noted that it had decided that a limited bench trial was necessary based on its own research, and it had specifically stated in its revised order that if either party sought a modification of the expedited schedule, it must file a Notice stating its position by August 31. The trial court emphasized that the State did not file such a notice, and to the contrary, it represented that it was "fully prepared to go forward with the proposed schedule." According to the final order, it was not until oral argument on the motions in limine, at the beginning of trial, that the State complained that the expedited schedule made it impossible to have witnesses present.

The order stated that all four motions in limine were granted. The trial court stated

that the effect of its granting the four motions in limine was "the State not being permitted to present proof and the Plaintiff prevailing." The trial court explained that the "temporal restriction on political speech" found in Tennessee Code Annotated section 2-10-117 was subject to the "closely-drawn" test set forth in *Buckley v. Valeo*, 424 U.S. 1 (1976). The trial court found that TSEL's additional challenges to the statutes – based on speaker-based discrimination, content discrimination, and discrimination based on political association – were subject to strict scrutiny.

Having failed to present any evidence at trial, the trial court found that the State failed to meet its burden of proof as to the constitutionality of Tennessee Code Annotated sections 2-10-117 and -121. The trial court entered a declaratory judgment that both statutes are unconstitutional, both facially and as applied, in violation of the First and Fourteenth Amendments to the United States Constitution and Article I, section 19 of the Tennessee Constitution. The trial court permanently enjoined the Registry from enforcing the two statutes. However, the trial court dismissed the District Attorney General from the action, without prejudice, pending the conclusion of appellate review. The Registry timely filed a notice of appeal to this Court.

## II. ISSUES PRESENTED

The State presents the following issues for review on appeal:

1. Whether the trial court abused its discretion in excluding all the evidence proffered by the State in support of the constitutionality of the two statutes;

2. Whether TSEL's constitutional challenge to Tennessee Code Annotated section 2-10-121 is moot due to a recent statutory amendment; and

3. Whether the trial court erred in declaring Tennessee Code Annotated section 2-10-117 unconstitutional.

In its posture as appellee, TSEL asserts that the trial court did not abuse its discretion in granting the four motions in limine. It also argues that the constitutional challenge to Tennessee Code Annotated section 2-10-121 was not rendered moot by the statutory amendment. TSEL maintains that the trial court correctly held that Tennessee Code Annotated section 2-10-121 is unconstitutional. TSEL also raises the following additional issues on appeal:

4. Whether the District Attorney General should be enjoined from enforcing Tennessee Code Annotated section 2-10-117 and -121; and

5. Whether TSEL is entitled to an award of attorney's fees incurred on appeal.

- 11 -

Amicus curiae briefs were filed on appeal by the Beacon Center of Tennessee, the Goldwater Institute, and the Liberty Justice Center, who urge this Court to affirm the trial court's decision declaring Tennessee Code Annotated section 2-10-117 unconstitutional.

For the following reasons, we affirm and remand for further proceedings.

## III. DISCUSSION

### A. *Four Motions in Limine*

"Trial courts have broad discretion with respect to the admission or exclusion of evidence and the enforcement of local rules." *Zaire v. Roshan-Far*, No. M2011-00012-COA-R3-CV, 2012 WL 1965606, at *7 (Tenn. Ct. App. May 31, 2012); *Cato v. Batts*, No. M2009-02204-COA-R3-CV, 2011 WL 579153, at *10 (Tenn. Ct. App. Feb. 17, 2011). An appellate court will not reverse a trial court's decision on the admissibility of evidence, including a ruling on a motion in limine, absent a clear abuse of the wide discretion given it to handle such motions. *Pullum v. Robinette*, 174 S.W.3d 124, 137 (Tenn. Ct. App. 2004). The burden of establishing such an abuse of discretion is on the party seeking to overturn the ruling on appeal. *Metro. Gov't of Nashville & Davidson Cty. v. Cuozzo*, No. M2007-01851-COA-R3-CV, 2008 WL 3914890, at *2 (Tenn. Ct. App. Aug. 25, 2008). The ruling should be upheld if reasonable minds can disagree as to the propriety of the decision made. *Id.*

Here, the trial court granted all four motions in limine filed by TSEL prior to trial. Accordingly, we address the trial court's rulings on each motion separately.

### 1. Motion in Limine Number One – Witness Testimony

The first motion in limine sought to exclude the testimony of Drew Rawlins, the sole witness disclosed by the State. TSEL argued that exclusion was appropriate because the trial court's order required the State to file its witness list by September 14 and include "a brief description as to what the Defendants expect the witnesses will testify about at trial," and the State listed a witness but failed to include any description of the expected testimony.

When reviewing a trial court's decision to exclude the testimony of a witness who was not disclosed in accordance with the Tennessee Rules of Civil Procedure or local rules, this Court has considered the following factors: "'the explanation given for the failure to name the witness, the importance of the testimony of the witness, the need for time to prepare to meet the testimony, and the possibility of a continuance.'" *Pennington v. Pennington*, No. M2007-00181-COA-R3-CV, 2008 WL 1991117, at *3 (Tenn. Ct. App. May 7, 2008) (quoting *Strickland v. Strickland*, 618 S.W.2d 496, 501 (Tenn. Ct. App. 1981)). We find these considerations equally relevant to this situation, involving

failure to disclose the substance of a witness's testimony in accordance with a pre-trial order. "'In the light of these considerations, the court may permit the witness to testify, or it may exclude the testimony, or it may grant a continuance so that the other side may take the deposition of the witness or otherwise prepare to meet the testimony.'" *Id.* (quoting *Strickland*, 618 S.W.2d at 501).

Regarding the first factor, the State offers little justification for its failure to comply with the trial court's order. It suggests that because it listed the witness's job title of "Executive Director" of the Registry, "the State believed that the substance of his expected testimony would be self-evident." This is the same explanation the State provided to the trial court. Its counsel thought that the substance of the witness's testimony would have been "pretty obvious." The trial court found that the State "inexplicably failed to comply" with its order, and we agree. Regardless of counsel's subjective belief as to the obvious nature of the testimony, the State made no attempt to comply with the clear instruction from the trial court to provide a brief description as to what it expected the witness to testify about at trial.

The second factor to consider is the importance of the testimony of the witness. The trial judge recognized that its ruling "had the effect of the State not being permitted to present proof[.]" At the same time, however, the court noted that the State had taken the position earlier in the proceedings that it "would not and did not need to present evidence in this matter[.]" These are valid considerations. The State had disclaimed any need to present evidence, and it was only doing so at the trial court's direction. At that point, we recognize that the testimony of Mr. Rawlins became important to the State, as he was the State's only witness. However, this fact made his testimony equally important to TSEL in preparing for trial.

The third factor is the need for time to prepare to meet the testimony. The trial court's order requiring the production of the witness list and description of the testimony contemplated that once TSEL received that information, TSEL would then determine whether depositions and additional time for discovery were needed. Even after TSEL filed its motion in limine, the State made no attempt to correct its error by supplementing its witness list with the required information. On the morning of trial, TSEL still did not know what testimony the State planned to elicit from Mr. Rawlins. The trial judge made the following relevant observation during its oral ruling on the motions in limine:

> [T]he State failed to comply with measures that this Court had put in its order to regulate and provide structure and fair notice when we were having a bench trial on an expedited basis.
>     The Court was careful and thoughtful in crafting regulations so that the trial of this case would be fair, even though it was expedited, and the State has not complied with the Court's order. The State did not provide a description of the testimony that would be given by its witness.

- 13 -

. . . .

The Court concludes that the way that the State has proceeded, it has the effect of a trial by ambush, and it doesn't provide an opportunity for the other side to defend against the proof that the plaintiff seeks -- that the defendant, the State, seeks to offer.

Again, the record supports the trial judge's conclusions.

The final factor is the possibility of a continuance. The trial judge acknowledged that in the normal situation a continuance and possible sanction of attorney's fees would have been appropriate, but it explained that a continuance was not possible in this case. The trial judge explained that "[t]he State had consented to an expedited bench trial given that the statutes in issue have a bearing on the upcoming November 6, 2018 election."

Given the trial court's thoughtful analysis of the aforementioned considerations, we cannot say that the trial court abused its discretion in deeming it appropriate to exclude the testimony of Drew Rawlins. We affirm its decision as to the first motion in limine.

### 2. Motion in Limine Number Two – Exhibits One through Six – Affidavits

The second motion in limine sought exclusion of exhibits one through six on the State's exhibit list. Those six exhibits were affidavits of various individuals. TSEL argued that these affidavits constituted inadmissible hearsay pursuant to Tennessee Rule of Evidence 801(c). TSEL asserted that the affidavits should not be admitted because doing so would deprive it of the opportunity to cross-examine the witnesses. At the hearing on the motion in limine, counsel for the State did not mention the Rules of Evidence but simply responded by stating that "because of the expedited basis of this trial, there was no way that we could have these witnesses available today."

The trial judge found no merit in that explanation, stating in her oral ruling:

The Court [] put in footnote 1 of its order that if there were difficulties or problems complying with the deadlines, that relief should be sought from the Court, and the Court anticipated or acknowledged that that was a possibility. The State never came forward and asked for any additional time or measures in which to put their evidence on before the Court, other than the limited bench trial that the Court had set up.

To the contrary, the court noted, the State affirmatively represented that it was "fully prepared to go forward with the proposed schedule." It was not until the morning of trial, when responding to the motions in limine, that the State claimed, for the first time, that the expedited schedule made it impossible to secure the presence of its witnesses.

- 14 -

Consequently, the trial court stated that it granted the motion in limine for the reasons set forth in TSEL's motion.

On appeal, the State raises only a very narrow argument regarding the second motion in limine. Its brief asserts that the trial court "never analyzed the application of Tenn. R. Evid. 801(c) to any of the affidavits,"[6] and "[i]n the absence of any such analysis, it was improper for the court to rely on this 'additional reason' for granting Plaintiff's motion." We discern no merit in this vague assertion. It is not clear what additional "analysis" the State claims was necessary. The trial court stated that it was granting the motion in limine for the reasons set forth in TSEL's motion and advanced by its attorney during the hearing, and the basis of that motion and argument was that the affidavits constituted hearsay under Rule 801(c). The only reason the State offered to suggest that the affidavits were *not* hearsay was its claim that its witnesses were unavailable and their presence could not be secured because of the expedited nature of the proceeding. The trial court clearly rejected the validity of that argument. No further written analysis was necessary under the circumstances. *See* Tenn. R. Civ. P. 52.01 ("Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rules 41.02 and 65.04(6)."); *Gooding v. Gooding*, 477 S.W.3d 774, 782 n.5 (Tenn. Ct. App. 2015) (recognizing that "there are discretionary decisions for which Tenn. R. Civ. P. 52.01 compliance is neither applicable nor mandated"); *PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Mabry*, 402 S.W.3d 654, 660 (Tenn. Ct. App. 2012) (noting that findings of fact and conclusions of law are preferable but declining to vacate an order on a motion not listed in Rule 52.01 for lack of findings "in light of the clear language" of the Rule stating that findings of fact and conclusions of law are unnecessary on unspecified motions). We discern no reversible error in the trial court's written analysis and affirm the trial court's decision with respect to the second motion in limine.

### 3.      Motion in Limine Number Three – Exhibits Seven through Twenty-Four

The third motion in limine filed by TSEL addressed the remaining exhibits, numbered seven through twenty-four. TSEL argued that some of these exhibits were inadequately described, but in any event, they should all be excluded as conditionally irrelevant pursuant to Tennessee Rule of Evidence 104(b). TSEL asserted that none of the remaining exhibits were relevant if the State could not first demonstrate that the statutes were narrowly tailored to achieve the interests it asserted.

---

[6] Tennessee Rule of Evidence 801(c) provides:

The following definitions apply under this article:

. . .

(c) Hearsay. "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

The trial court granted this motion as well. However, the State has failed to present any argument on appeal with respect to the third motion in limine. It broadly framed its issue to contend that the trial court abused its discretion in "excluding all of the State's evidence," but the three subsections that follow only address the other three motions in limine. In its posture as appellee, TSEL argues in its brief on appeal that the State's brief "fails to address the Plaintiff's Third Motion in Limine in any regard, resulting in waiver of any claim of error[.]" We agree. "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Responsibility of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010). We therefore affirm the trial court's ruling on the third motion in limine.

Because we have affirmed the trial court's rulings with respect to the second motion in limine, excluding exhibits one through six, and the third motion in limine, excluding the remaining exhibits, it is not necessary to address the trial court's ruling with respect to the fourth motion in limine, which sought exclusion of exhibits one through twenty-four for failure to exchange the exhibits as required by the local rule. That issue is pretermitted.

### B. Mootness

The second issue raised by the State on appeal is "[w]hether [TSEL's] constitutional challenge to Tenn. Code Ann. § 2-10-121 is moot." Notably, the State does not present any argument to suggest that the trial court's ruling regarding the constitutionality of this statute was incorrect. It simply argues that because of a recent statutory amendment, TSEL's constitutional challenge is now moot. The State asks this court to vacate the trial court's judgment declaring the statute unconstitutional and enjoining its enforcement.

"A case must remain justiciable (remain a legal controversy) from the time it is filed until the moment of final appellate disposition." *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Cty.*, 301 S.W.3d 196, 203-204 (Tenn. 2009). A case may lose its justiciability and become moot "either by court decision, acts of the parties, or some other reason occurring after commencement of the case." *Id.* at 204. The case is deemed moot "if it no longer serves as a means to provide some sort of judicial relief to the prevailing party." *Id.* "A case, or an issue in a case, becomes moot when the parties no longer have a continuing, real, live, and substantial interest in the outcome." *Hooker v. Haslam*, 437 S.W.3d 409, 417 (Tenn. 2014). Deciding whether an issue is moot is a question of law. *Shealy v. Policy Studies, Inc.*, No. E2005-01124-COA-R3-CV, 2006 WL 2482984, at *5 (Tenn. Ct. App. Aug. 29, 2006). "In the absence of an explicit constitutional imperative, decisions to dismiss a case on the ground of mootness require

the exercise of judgment based on the facts and circumstances of the case." *Norma Faye Pyles*, 301 S.W.3d at 204.

"The long and well established rule in this State is that the Court will not decide a moot question, though it be the question of constitutionality of a statute.'" *Hooker*, 437 S.W.3d at 417 (quotation omitted). For instance, "[w]here the plaintiff challenged the constitutionality of a statute and the statute was repealed after the case was initiated but before it was heard, the repeal rendered the case moot, since the challenged statute was no longer the law of the land." *Id.* Similarly, we have held that a constitutional challenge to a statute was moot where a statutory amendment removed "the language serving as the basis for Petitioners' constitutional challenge." *Pylant v. Haslam*, No. M2011-02341-COA-R3-CV, 2012 WL 3984648, at *4 (Tenn. Ct. App. Sept. 11, 2012).

The United States Court of Appeals for the Sixth Circuit has addressed the concept of mootness as it relates to a statutory amendment to campaign finance laws being considered on appeal for constitutionality under the First Amendment:

> Legislative repeal or amendment of a challenged statute while a case is pending on appeal usually eliminates th[e] requisite case-or-controversy[7] because a statute must be analyzed by the appellate court in its present form. *See, e.g., Kremens v. Bartley*, 431 U.S. 119, 129, 97 S.Ct. 1709, 1715, 52 L.Ed.2d 184 (1977); *Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 201-02, 24 L.Ed.2d 214 (1969). Applying this principle in the First Amendment context, the Supreme Court has routinely declared moot those claims effectively nullified by statutory amendment pending appeal. *Massachusetts v. Oakes*, 491 U.S. 576, 582-84, 109 S.Ct. 2633, 2637–39, 105 L.Ed.2d 493 (1989); *Bigelow v. Virginia*, 421 U.S. 809, 817–18, 95 S.Ct. 2222, 2230–31, 44 L.Ed.2d 600 (1975).

*Kentucky Right to Life, Inc. v. Terry*, 108 F.3d 637, 644 (6th Cir. 1997).

In the case at bar, TSEL's complaint alleged that Tennessee Code Annotated section 2-10-121 was unconstitutional because, when the complaint was filed, the statute imposed a $100 annual fee exclusively on nonpartisan multicandidate political action committees. At that time, the statute provided:

> No later than January 31 of each year, each multicandidate political campaign committee registered with the registry of election finance shall

---

[7] "Tennessee's courts do not have a constitutional limitation on their jurisdiction similar to the 'case or controversy' requirement in Article III, Section 2 of the United States Constitution. They have, however, recognized justiciability doctrines similar to those developed by the United States Supreme Court to determine when courts should hear a case." *State ex rel. Cunningham v. Farr*, No. M2006-00676-COA-R3-CV, 2007 WL 1515144, at *2 (Tenn. Ct. App. May 23, 2007).

pay a registration fee to be determined by rule promulgated pursuant to § 4-55-103(1). . . . All fees collected under this section shall be retained and used for expenses related to maintaining an electronic filing system. This section shall not apply to any statewide political party as defined in § 2-1-104 or subsidiaries of the political party.

Tenn. Code Ann. § 2-10-121 (2018). TSEL emphasized that the fee is assessed against *nonpartisan* political campaign committees but not party-controlled political campaign committees *or* individual contributors. It alleged that this assessment against disfavored political speakers was unconstitutional, as it expressly discriminated based on political association, charging only "disfavored non-party political speakers" the $100 fee "while charging favored partisan speakers nothing."[8] TSEL further asserted,

By assessing fees to non-party PACs but exempting both 'any statewide political party as defined in § 2-1-104 or subsidiaries of the political party' and individual political speakers, Tenn. Code Ann. § 2-10-121 is unconstitutional both facially and as applied to [TSEL] because it discriminates on the basis of a speaker's political association.

In its final order, the trial court found that TSEL's challenge to this statute "based on political association" was subject to strict scrutiny, and because the State failed to submit any evidence in defense of the constitutionality of the statute, the trial court ruled in favor of TSEL. It declared that section 2-10-121 was unconstitutional "both facially and as applied, violat[ing] the First and Fourteenth Amendments to the United States Constitution and Article I, § 19 of the Tennessee Constitution[.]"

The statute was amended effective April 1, 2019. *See* 2019 Pub. Acts, c. 77, § 1. The amended version of the statute removes the exemption for statewide political parties and their subsidiaries:

No later than January 31 of each year, each multicandidate political campaign committee registered with the registry of election finance shall pay a registration fee to be determined by rule promulgated pursuant to § 4-55-103(1). Payment of the registration fee by one (1) affiliated political campaign committee includes any disclosed affiliated committees registering separately; payment of the registration fee by a statewide political party, as defined in § 2-1-104, includes any disclosed subsidiaries of the political party registering separately. . . . All fees collected under this section shall be retained and used for expenses related to maintaining an electronic filing system.

---

[8] TSEL sought an injunction prohibiting enforcement of the statute but did not seek a return of the fees it had previously paid.

- 18 -

Tenn. Code Ann. § 2-10-121 (2019).  Because of the removal of the political party exemption, the State contends that TSEL's constitutional challenge has become moot.

In response, TSEL recognizes that the statutory amendment "partially cured the statute's central constitutional defect."  However, TSEL insists that the statute remains unconstitutionally discriminatory even as amended, and the issue has not become moot, because the statute continues to charge a fee to some political speakers based solely on their political association.  TSEL notes that its complaint about the statute was not simply based on the exemption for political parties but also the exemption for "individual political speakers."  TSEL points to its argument before the trial court that the fee should apply "equally to all speakers, or else, not at all."  Because individual political speakers still do not have to pay the fee in order to make campaign contributions, TSEL argues that the statute remains unconstitutional.  TSEL further notes that only *multicandidate* political campaign committees must pay the fee, while other types of political campaign committees do not.

We reiterate that the limited issue before this Court is whether TSEL's constitutional challenge is now moot.  We are not asked to review the substance of the trial court's ruling regarding the constitutionality of Tennessee Code Annotated section 2-10-121, nor are we asked to consider the constitutionality of the statute as amended.  Having carefully reviewed the allegations of the complaint and the trial court's order, we conclude that TSEL's constitutional challenge is not moot.  TSEL specifically alleged that the statute was unconstitutional because it discriminated on the basis of political association by exempting *both* political parties *and* "individual political speakers" from paying the fee.  The allegations in TSEL's complaint were broad enough to challenge not only the differential treatment of political parties but also the differential treatment of individuals, so its claim was not rendered moot or nullified by the statutory amendment removing only the exemption for political parties.  The State is not entitled to relief with respect to this issue.

### C.   *Constitutionality of Tenn. Code Ann. § 2-10-117*

The next issue raised by the State on appeal is whether the trial court erred in declaring Tennessee Code Annotated section 2-10-117 unconstitutional.  The determination of whether a statute is constitutional is a question of law, which we review de novo on appeal.  *State v. Decosimo*, 555 S.W.3d 494, 506 (Tenn. 2018).  The trial court found that section 2-10-117, "both facially and as applied, violate[s] the First and Fourteenth Amendments to the United States Constitution and Article I, § 19 of the Tennessee Constitution[.]"

"A facial challenge involves the constitutionality of the statute as written, while an as applied challenge is evaluated considering how the statute operates in practice against

- 19 -

the particular litigant and under the facts of the instant case rather than hypothetical facts." *Nunn v. Tenn. Dep't of Corr.*, 547 S.W.3d 163, 173 n.7 (Tenn. Ct. App. 2017). The distinction between facial and as-applied challenges "goes to the breadth of the remedy employed by the Court." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). "A facial challenge to a statute involves a claim that the statute fails an applicable constitutional test and should be found invalid in all applications." *Waters v. Farr*, 291 S.W.3d 873, 921 (Tenn. 2009).

TSEL's complaint alleged both facial and as-applied challenges to section 2-10-117. In addition to the relief it sought particular to its own circumstances, with respect to the aforementioned primary election, TSEL sought a declaratory judgment that the statute is facially unconstitutional and a permanent injunction enjoining the enforcement of section 2-10-117. Because this relief extends beyond the circumstances of this particular plaintiff, and because no evidence was presented at the limited bench trial, we will analyze the claim as a facial challenge to the constitutionality of the statute. *See Justice v. Hosemann*, 771 F.3d 285, 292 (5th Cir. 2014) ("Although as-applied challenges are generally favored as a matter of judicial restraint because they result in a narrow remedy, a developed factual record is essential.").

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." To properly analyze the issues on appeal, we begin with the United States Supreme Court's seminal campaign finance decision in *Buckley v. Valeo*, 424 U.S. 1 (1976). In that case, various plaintiffs sought a declaratory judgment that the major provisions of the Federal Election Campaign Act of 1971 were unconstitutional. *Id.* at 6-9. The Act regulated federal election campaigns, imposing ceilings on political contributions and election expenditures and requiring disclosure of the source of campaign contributions. *Id.* at 12-13. At the outset, the Supreme Court explained:

> The Act's contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order "to assure (the) unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957). Although First Amendment protections are not confined to "the exposition of ideas," *Winters v. New York*, 333 U.S. 507, 510, 68 S.Ct. 665, 667, 92 L.Ed. 840 (1948), "there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. . . . of course includ(ing) discussions of candidates . . . ." *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966). This no more than reflects our "profound national commitment

- 20 -

to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation. As the Court observed in *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971), "it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office."

*Id.* at 14-15.

Even though the Act did not focus on the particular ideas being expressed by the groups being regulated, it was "aimed in part at equalizing the relative ability of all voters to affect electoral outcomes by placing a ceiling on expenditures for political expression by citizens and groups." *Id.* at 17. By limiting contributions and expenditures, the Act imposed "direct quantity restrictions on political communication and association by persons, groups, candidates, and political parties." *Id.* at 18. The Court added,

A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs. Speeches and rallies generally necessitate hiring a hall and publicizing the event. The electorate's increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensable instruments of effective political speech.

*Id.* at 19 (footnote omitted).

The Court also explained that "[t]he First Amendment protects political *association* as well as political expression." *Id.* at 15 (emphasis added). "[T]he First and Fourteenth Amendments guarantee freedom to associate with others for the common advancement of political beliefs and ideas, a freedom that encompasses the right to associate with the political party of one's choice." *Id.* (internal quotations omitted). The Court found that the Act's contribution and expenditure limitations "impinge[d] on protected associational freedoms." *Id.* at 22. "Making a contribution, like joining a political party, serves to affiliate a person with a candidate. In addition, it enables like-minded persons to pool their resources in furtherance of common political goals." *Id.*

- 21 -

Ultimately, the Supreme Court applied different levels of scrutiny to the various types of campaign finance regulations. First, it drew a distinction between direct contributions to a candidate's campaign and independent spending for election-related communication (or expenditures).[9] *Id.* at 19-21. Limits on independent expenditures for political communication represent substantial restraints "on the quantity and diversity of political speech." *Id.* at 19. In contrast, limits on the amount that a person or group can contribute to a candidate impose a lesser restriction on the contributor's ability to engage in free communication. *Id.* at 20. "A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support." *Id.* at 21. Thus, a limit on the amount of money one may give to a candidate "involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues." *Id.* Even though a contribution "may result in political expression if spent by a candidate" to present views to voters, that "transformation of contributions into political debate involves speech by someone other than the contributor." *Id.* As such, the "primary First Amendment problem" presented by a contribution limitation is its "restriction of one aspect of the contributor's freedom of political association." *Id.* at 24.

In summary, the Supreme Court found that the Act's contribution and expenditure limitations both implicated fundamental First Amendment interests, but the expenditure limits imposed "significantly more severe restrictions on protected freedoms of political expression and association" than the limits on direct financial contributions. *Id.* at 23. For the expenditure limits, the Court analyzed "whether the governmental interests advanced in its support satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression." *Id.* at 44-45. It applied a less stringent, intermediate standard to review the limits on contributions. Even though contribution limits restrict one's freedom of association, the Court said, "a significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* at 25 (quotations omitted).

Analyzing the Act's $1,000 limit on contributions, the Court found that the government's asserted interest in limiting "the actuality and appearance of corruption resulting from large individual financial contributions" was "a constitutionally sufficient justification" for the contribution limitation. *Id.* at 26. Congress was entitled to conclude that contribution ceilings were necessary "to deal with the reality or appearance of

---

[9] "Later cases have respected this line between contributing and spending." *Fed. Election Comm'n v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 437 (2001). Accordingly, contributions and expenditures are "terms of art" in campaign finance law. *Emison v. Catalano*, 951 F. Supp. 714, 720 n.2 (E.D. Tenn. 1996).

corruption inherent in a system permitting unlimited financial contributions." *Id.* at 28. The Court found that the $1,000 limit focused precisely on the problem of large direct campaign contributions while leaving persons free to engage in independent political expression. *Id.* In sum, the Court concluded, "under the rigorous standard of review established by our prior decisions, the weighty interests served by restricting the size of financial contributions to political candidates are sufficient to justify the limited effect upon First Amendment freedoms caused by the $1,000 contribution ceiling." *Id.* at 29. The contribution ceilings "serve[d] the basic governmental interest in safeguarding the integrity of the electoral process without directly impinging upon the rights of individual citizens and candidates to engage in political debate and discussion." *Id.* at 58.

Finally, the Supreme Court considered a third category of campaign finance regulation contained in the Act – disclosure requirements, which required reporting the source of contributions. Unlike the monetary limits on contributions and expenditures, the Court explained, "disclosure requirements impose no ceiling on campaign-related activities."[10] *Id.* at 64. Still, the Court recognized that "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Id.* Such encroachments on First Amendment rights "cannot be justified by a mere showing of some legitimate governmental interest" and "must survive exacting scrutiny." *Id.* There must be a "relevant correlation" or "substantial relation" between the governmental interest asserted and the information required to be disclosed. *Id.* The Court found that the Act's disclosure requirements survived that level of scrutiny. Disclosure requirements provide the electorate with information as to where campaign money comes from and how it is spent; they deter corruption and its appearance by exposing large contributions and expenditures to the light of publicity; and they provide data necessary to detect violations of contribution limitations. *Id.* at 66-68.

As *Buckley* demonstrates, in the campaign finance context, the "degree of scrutiny turns on the nature of the activity regulated." *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 162 (2003). More specifically, "the level of scrutiny is based on the importance of the 'political activity at issue' to effective speech or political association." *Id.* at 161. The Court of Appeals for the Fifth Circuit has succinctly summarized the *Buckley* framework as follows:

> *Buckley* and its progeny instruct that we should give varying levels of constructional scrutiny to campaign-finance regulations depending on the type of regulation at issue:
>
> • Expenditure limitations receive "the exacting scrutiny applicable to limitations on core First Amendment rights of political expression."

---

[10] "Disclosure laws generally require registration, reporting information, or keeping necessary records." *Missourians for Fiscal Accountability v. Klahr*, 892 F.3d 944, 949 (8th Cir. 2018).

*Buckley*, 424 U.S. at 44-45[.] A regulation limiting expenditures may only be upheld if the regulation "promotes a compelling interest and is the least restrictive means to further the articulated interest." *McCutcheon*, 134 S.Ct. at 1444.

• Contribution limitations receive a lessened, but nonetheless rigorous, level of scrutiny. Regulations limiting contributions may only be upheld if "the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *Id.* (internal quotation marks omitted).

• Disclosure and organizational requirements receive a further lessened level of scrutiny. To defend disclosure and organizational requirements, the government must show a "sufficiently important governmental interest that bears a substantial relation" to the requirement. *SpeechNow.org v. FEC*, 599 F.3d 686, 696 (D.C. Cir. 2010) (en banc) (internal quotation marks omitted).

*Catholic Leadership Coal. of Texas v. Reisman*, 764 F.3d 409, 424-25 (5th Cir. 2014).

Regardless of which of the three tests we are applying, "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *McCutcheon*, 572 U.S. at 210. "The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 391 (2000). The Supreme Court has "never accepted mere conjecture as adequate to carry a First Amendment burden." *Id.* at 392. However, the Supreme Court has not specifically provided "further definition of whatever the State's evidentiary obligation may be." *Id.* at 393.

We now turn to the Tennessee statute at issue in this case.[11] Tennessee Code

---

[11] "[T]he First Amendment's prohibition on laws abridging the freedom of speech applies to state governments through the Fourteenth Amendment." *Frazier ex rel. Frazier v. Winn*, 535 F.3d 1279, 1284 n.4 (11th Cir. 2008). "'[M]any elements of the *Buckley* approach are required by the [F]irst [A]mendment, which means that they apply to the states.'" *Wis. Right To Life, Inc. v. Barland*, 751 F.3d 804, 810 (7th Cir. 2014) (quoting *Wis. Right to Life, Inc. v. Paradise*, 138 F.3d 1183, 1184 (7th Cir. 1998)). "[S]tates have no greater power to restrain an individual's freedoms protected by the First Amendment than does the Congress of the United States." *Suster v. Marshall*, 149 F.3d 523, 529-30 (6th Cir. 1998).

There are very few Tennessee cases regarding campaign finance law. However, another Tennessee statute was held by a district court to be unconstitutional as-applied. *See Emison v. Catalano*, 951 F.Supp. 714, 722-23 (E.D. Tenn. 1996). The statute imposed a ban on contributions to state legislative candidates during the legislative session. *Id.* at 717. The court stated, "[A] black-out provision like that in T.C.A. § 2-10-310(a), although inspired by the commendable impulse to eliminate corruption

- 24 -

Annotated section 2-10-117 provides:

> No multicandidate political campaign committee other than a committee controlled by a political party on the national, state, or local level or by a caucus of such political party established by members of either house of the general assembly shall make a *contribution* to any candidate after the tenth day before an election until the day of the election.

(emphasis added). "Like individuals, PACs enjoy the right to freedom of speech and association." *Free & Fair Election Fund v. Missouri Ethics Comm'n*, 903 F.3d 759, 763 (8th Cir. 2018) *cert. denied* 139 S. Ct. 1601 (2019). The State and TSEL agree that the statute's temporal restriction on contributions, at its basic level, is subject to the intermediate level of scrutiny applied in *Buckley*, commonly known as the "closely drawn" test.[12] We agree. Contribution bans receive the same treatment as contribution limits under *Buckley*. *Schickel v. Dilger*, 925 F.3d 858, 869 (6th Cir. 2019).

The State argued before the trial court that this statute is "a crucial part of [Tennessee's] disclosure scheme." However, that does not mean that this restriction on contributions should be reviewed under the lower level of scrutiny applicable to disclosure regulations. As the Supreme Court recognized in *Buckley*, disclosure regulations are treated differently than contribution and expenditure limits because "disclosure requirements impose no ceiling on campaign-related activities." 424 U.S. at 64. States cannot "sidestep" a higher level of scrutiny by simply labeling their campaign finance regulations as disclosure laws. *Missourians*, 892 F.3d at 949. To determine whether a campaign finance rule is a disclosure requirement or something more, we look to the effect of the provision. *Id.* Disclosure requirements "'do not prevent anyone from speaking.'" *Id.* (quoting *Iowa Right to Life Comm., Inc. v. Tooker*, 717 F.3d 576, 589-90 (8th Cir. 2013)). Tennessee Code Annotated section 2-10-117 is not a disclosure law because "it prohibits speech even if the [] group is willing to register, report information, keep necessary records, and take organizational steps." *See id.* at 950. The fact that the statute may arguably encourage compliance with disclosure laws or prevent circumvention of disclosure laws "does not make it a disclosure requirement." *Id.* We

---

and the appearance of corruption in political life, cannot constitutionally be applied to contributions to nonincumbent candidates for seats in the legislature." *Id.* at 723. Nonincumbents were not subject to corrupting *quid pro quo* arrangements in the same way as sitting legislators. *Id.* The statute has since been amended.

[12] TSEL agrees that the statute's temporal restriction on contributions is subject to the closely drawn test. However, TSEL argues that the statute discriminates in its application of the contribution restriction, applying it only to certain groups, and therefore, that additional facet of the statute should be examined using strict scrutiny. The amici curiae argue in favor of strict scrutiny but also contend that the statute cannot survive even closely drawn scrutiny. For reasons that we will explain in more detail later, we find it appropriate to begin with the issue of whether the statute's restriction on contributions satisfies the closely drawn test.

review Tennessee Code Annotated section 2-10-117 as a restriction on contributions.

In the years since *Buckley*, the United States Supreme Court has repeatedly held that "Congress may regulate campaign contributions to protect against corruption or the appearance of corruption." *McCutcheon*, 572 U.S. at 191. At the same time, however, the Court has "consistently rejected attempts to suppress campaign speech based on other legislative objectives." *Id.* at 207. For instance, "it is not an acceptable governmental objective to 'level the playing field,' or to 'level electoral opportunities,' or to 'equaliz[e] the financial resources of candidates.'" *Id.* "Congress may not regulate contributions simply to reduce the amount of money in politics, or to restrict the political participation of some in order to enhance the relative influence of others." *Id.* at 191. In fact, the Court "has identified only one legitimate governmental interest for restricting campaign finances: preventing corruption or the appearance of corruption." *Id.* at 206. Thus, the Court has "spelled out how to draw the constitutional line between the permissible goal of avoiding corruption in the political process and the impermissible desire simply to limit political speech." *Id.* at 192. Still, "the anticorruption rationale itself 'is not boundless.'" *Catholic Leadership Coal. of Texas*, 764 F.3d at 425 (quoting *Emily's List v. FEC*, 581 F.3d 1, 6 (D.C. Cir. 2009)). A campaign finance regulation must target a specific type of corruption – what the Court has called "*quid pro quo*" corruption or its appearance.[13] *McCutcheon*, 572 U.S. at 192. "Campaign finance restrictions that pursue other objectives, [the Supreme Court has] explained, impermissibly inject the Government into the debate over who should govern." *Id.*

In summary, the "closely drawn" test requires us to consider "whether the restriction is 'closely drawn' to match what [the Supreme Court has] recognized as the 'sufficiently important' government interest in combating political corruption." *Col. Republican*, 533 U.S. at 456 (quoting *Shrink Missouri*, 528 U.S. at 387-88). The Supreme Court "do[es] not doubt the compelling nature of the 'collective' interest in preventing corruption in the electoral process," but it permits Congress "to pursue that

---

[13] The Supreme Court elaborated on the definition of *quid pro quo* corruption in *McCutcheon*, 572 U.S. at 207-08 (internal citations and quotations omitted)*:*

> As *Buckley* explained, Congress may permissibly seek to rein in large contributions that are given to secure a political *quid pro quo* from current and potential office holders. In addition to actual *quid pro quo* arrangements, Congress may permissibly limit the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions to particular candidates.
>     Spending large sums of money in connection with elections, but not in connection with an effort to control the exercise of an officeholder's official duties, does not give rise to such *quid pro quo* corruption. Nor does the possibility that an individual who spends large sums may garner influence over or access to elected officials or political parties. And because the Government's interest in preventing the appearance of corruption is equally confined to the appearance of *quid pro quo* corruption, the Government may not seek to limit the appearance of mere influence or access.

interest only so long as it does not unnecessarily infringe an individual's right to freedom of speech." *McCutcheon*, 572 U.S. at 206. "In the First Amendment context, fit matters." *Id.* at 218. The "closely drawn" test requires "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' ... that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective." *Id.* Simply put, "we must assess the fit between the stated governmental objective and the means selected to achieve that objective." *Id.* at 199. If the law does not avoid unnecessary abridgement of First Amendment rights, it cannot survive rigorous review. *Id.*

Turning back to Tennessee law, we note that Tennessee's campaign finance laws already impose base limits on contributions, which restrict how much money a donor may contribute to a particular candidate. Tenn. Code Ann. § 2-10-302.[14] The base limits serve as the primary means of regulating campaign contributions. *See McCutcheon*, 572 U.S. at 209. Tennessee Code Annotated section 2-10-117 then imposes an additional temporal restriction on contributions by multicandidate political campaign committees. Unless they are "controlled by a political party on the national, state, or local level or by a caucus of such political party established by members of either house of the general assembly," they cannot "make a contribution to any candidate after the tenth day before an election until the day of the election."[15] *Id.* The State argues that this blackout period prevents corruption. Of course, it has presented no admissible evidence to support that assertion. It simply references a concern about "large undisclosed PAC contributions to

_____

[14] In Tennessee, multicandidate political campaign committees are subject to base contribution limits:

> (b) No multicandidate political campaign committee shall make contributions to any candidate with respect to any election which, in the aggregate, exceed:
> (1) For an office elected by statewide election or the senate, seven thousand five hundred dollars ($7,500); and
> (2) For any other state or local public office, five thousand dollars ($5,000).

Tenn. Code Ann. § 2-10-302. The contribution limits are adjusted in accordance with the consumer price index and published by the Registry on its website. Tenn. Code Ann. § 2-10-302(d). According to its website, the base limits on PAC contributions for elections held in 2017 and 2018 were $11,800 for senate and statewide candidates and $7,800 for "Local/House/Other State candidates." <https://www.tn.gov/tref/news/2017/1/27/tref-2017-18-limits.html>

[15] In *McCutcheon*, the Supreme Court scrutinized an "aggregate" limit on contributions above and beyond the usual "base" limits. 572 U.S. at 221. The Court explained that restrictions on contributions are already preventative because few if any contributions actually involve *quid pro quo* arrangements. *Id.* When additional aggregate limits were "layered on top," this resulted in a "prophylaxis-upon-prophylaxis approach," which required courts to be "particularly diligent in scrutinizing the law's fit." *Id.*; *see also Zimmerman v. City of Austin, Texas*, 881 F.3d 378, 392 (5th Cir.) *cert. denied sub nom.* 139 S.Ct. 639 (2018) ("[F]ollowing *McCutcheon*, an additional limit on contributions beyond a base contribution limit that is already in place must be justified by evidence that the additional limit serves a distinct interest in preventing corruption that is not already served by the base limit.")

candidates" in the final days of an election.

Having an undeniably important interest in preventing corruption is not enough; the State must still demonstrate *how* its statute furthers that interest. *Schickel*, 925 F.3d at 870. "[T]o demonstrate that a contribution limit furthers an interest important enough to suppress the freedoms of political expression and political association, a state must do more than merely *recite* a general interest in preventing corruption. What *Buckley* requires is a demonstration, not a recitation." *Lavin v. Husted*, 689 F.3d 543, 547 (6th Cir. 2012) (internal quotation omitted).

The General Assembly has already selected base limits on contributions by multicandidate political campaign committees. Tenn. Code Ann. § 2-10-302(b). These base limits reflect the General Assembly's belief that contributions of that amount or less do not create a cognizable risk of corruption. *See McCutcheon*, 572 U.S. at 210. And if contributions of that amount or less do not raise a corruption concern, we do not perceive any additional risk of *quid pro quo* corruption simply because the same limited contribution is made during the last ten days of an election. *Compare Zimmerman*, 881 F.3d at 391 (explaining that the city failed to present evidence "to show how a contribution made seven months before election day presents a different threat of *quid pro quo* corruption than a contribution made three months before election day"). "[W]hat is needed to justify a temporal limit is additional to and distinct from what is needed to justify a dollar limit on contributions." *Id.* at 392. In light of the existing base limits, the State's stated concern regarding "large" contributions is less persuasive.

Aside from combating corruption, directly, the State also argues that the blackout period is necessary to prevent circumvention of its disclosure requirements. Indeed, the legislative history[16] submitted by the State reveals that the blackout period was added to "ensure that all PAC contributions are disclosed by a candidate prior to an election being conducted." Assuming *arguendo* that this is a sufficient governmental interest to justify a contribution restriction, the statute is not "closely drawn" to match the asserted governmental interest in preventing circumvention of the disclosure requirements (or combating political corruption, to the extent that the State is attempting to link the two).[17]

---

[16] This Court can take judicial notice of legislative history. *See, e.g.*, *Snyder v. First Tennessee Bank, N.A.*, No. E2015-00530-COA-R3-CV, 2016 WL 423806, at *10 n.8 (Tenn. Ct. App. Feb. 3, 2016).

[17] Preventing circumvention of *contribution* limits may be a valid theory of preventing corruption. *See, e.g.*, *McCutcheon*, 572 U.S. at 211 ("Even accepting the validity of [the] circumvention theory," concluding that the government failed to carry its burden of demonstrating that the restriction "further[ed] its anticircumvention interest."); *Thompson v. Hebdon*, 909 F.3d 1027, 1039-40 (9th Cir. 2018) (noting "*McCutcheon*'s tacit embrace of anticircumvention as an important state interest in combating quid pro quo corruption or its appearance"). However, in this case, the State asserts an interest in preventing circumvention of its *disclosure* laws. The same interest was asserted in *Missourians*, 892 F.3d at 952. The Eighth Circuit explained that the Supreme Court has identified corruption as the only legitimate governmental interest for restricting campaign finances, so it proceeded by "assuming, without deciding," that the asserted interest in preventing circumvention of a disclosure law was sufficiently important. *Id.*

"To clear the second hurdle of the closely drawn test, a state must show it employed 'means closely drawn to avoid unnecessary abridgment of associational freedoms.'" *Schickel*, 925 F.3d at 873 (quoting *McCutcheon*, 572 U.S. at 197).

One flaw in Tennessee Code Annotated section 2-10-117 is that it does not target large contributions. It bans all contributions of *any* amount. Rather than focusing on large potentially corrupting contributions, Tennessee Code Annotated section 2-10-117 bans even the smallest contribution during the blackout period. An outright ban, rather than a mere limit on contributions, is a drastic measure. *See Lavin*, 689 F.3d at 548 (explaining that the government could have taken a qualitatively less restrictive approach by limiting campaign contributions rather than imposing the drastic measure of banning them). The difference between a ban and a limit is not to be ignored and is considered when deciding whether a restriction on contributions is closely drawn. *Beaumont*, 539 U.S. at 162. In Tennessee, candidates are not even required to disclose donors who contribute $100 or less. *See* Tenn. Code Ann. § 2-10-107(a)(2)(A)(i) (requiring "a list of all the contributions received, including the full name, complete address, occupation, and employer of each person who contributed a total amount of more than one hundred dollars ($100) during the period for which the statement is submitted, and the amount contributed by that person"); Tenn. Code Ann. § 2-10-107(a)(2)(A)(iii) (permitting reporting "as a single item the total amount of contributions of one hundred dollars ($100) or less;"). Yet, section 117 bans any and all contributions by multicandidate political campaign committees during the blackout period. If the General Assembly believes that contributions of $100 or less do not create enough risk of corruption to warrant disclosing their source at any point during the campaign, we fail to see why nonpartisan multicandidate political campaign committees should be banned from making the same minimal contributions, with no little or no corruptive potential, during the final days before the election. The fact that the source of these contributions is not even subject to disclosure undermines the State's argument that a complete ban is necessary to prevent corruption and circumvention of the disclosure laws.

We also emphasize that the statute flatly bans all contributions during the pivotal final days before the election. Courts have recognized "'the unique importance of the temporal window immediately preceding a vote,' *when speech is more likely to be perceived as related to an election* and the public is more likely to pay attention to and be affected by such speech." *Nat'l Ass'n for Gun Rights, Inc. v. Mangan*, 933 F.3d 1102, 1117 (9th Cir. 2019) (quoting *Human Life of Washington Inc. v. Brumsickle*, 624 F.3d

---

Ultimately, the court found that the law was not narrowly tailored in any event. *See also Catholic Leadership Coal. of Texas*, 764 F.3d at 429 ("[T]o the extent that Texas tries to link circumvention of its disclosure requirements to its anticorruption interest—if such an argument is permissible at all—Texas does not demonstrate proper tailoring."). We likewise assume only for the sake of argument that this is a legitimate interest. *But see SpeechNow.org v. Fed. Election Comm'n*, 599 F.3d 686, 692 (D.C. Cir. 2010) ("An informational interest in 'identifying the sources of support for and opposition to' a political [] candidate is not enough to justify the First Amendment burden [of a contribution limit].")

990, 1019 (9th Cir. 2010)) (emphasis added).

> It is well known that the public begins to concentrate on elections only in
> the weeks immediately before they are held. There are short timeframes in
> which speech can have influence. The need or relevance of the speech will
> often first be apparent at this stage in the campaign. The decision to speak
> is made in the heat of political campaigns, when speakers react to messages
> conveyed by others.

*Citizens United*, 558 U.S. at 334. "[T]he practical reality [is] that oftentimes few observers know the critical issues in an election (and the candidates' position on those issues) until just days before." *Catholic Leadership Coal. of Texas*, 764 F.3d at 431. As the Fifth Circuit aptly noted, "October Surprises are not called October Surprises because they happen in June." *Id.*

During the blackout period, the statute allows not only individuals but also other types of political campaign committees to continue making direct contributions to candidates. It only prohibits *multicandidate* political campaign committees from contributing, not political campaign committees that support a single candidate or those multicandidate committees that are controlled by political parties or caucuses. The State has not presented any evidence to show that contributions from single-candidate committees are somehow less corrupting than contributions from multicandidate committees (which, by definition, support or oppose two or more candidates or measures). *See* Tenn. Code Ann. § 2-10-102(9).

With these shortcomings in mind, we return to the main argument espoused by the State—that the blackout period works in tandem with the State's disclosure scheme. Because the State requires a pre-election disclosure report to be filed seven days before an election, it argues that a blackout period "after the tenth day" is necessary to ensure that all contributions from multicandidate political campaign committees are actually reported in a timely manner. *See* Tenn. Code Ann. §§ 2-10-105, 2-10-117. According to the State, the blackout period supports the disclosure scheme by "eliminating a loophole" that would allow multicandidate political campaign committees to make large contributions "in the shadows." However, the State fails to provide any evidence that its blackout period "after the tenth day before an election" is actually necessary to serve its purposes. Modern technology has changed the way courts look at disclosure requirements. *See, e.g.*, *McCutcheon*, 572 U.S. at 224 (comparing the modern method of Internet disclosure with *Buckley*'s 1976 "world in which information about campaign contributions was filed at FEC offices and [] virtually inaccessible to the average member of the public"). "[S]tates began releasing campaign contribution data on the Internet in the late 1990's." Jacob Gardener, *Sunlight Without Sunburns: Balancing Public Access and Privacy in Ballot Measure Disclosure Laws*, 18 Boston Univ. J. Sci. & Tech. L. 262, 271 (2012). Since then, several courts in other jurisdictions have considered temporal

restrictions on contributions and expenditures that were allegedly necessary to support disclosure laws and other deadlines.

In *Catholic Leadership Coalition of Texas v. Reisman*, 764 F.3d 409, 414 (5th Cir. 2014), the Court considered a sixty-day $500 limit on contributions and expenditures by certain types of political action committees after formation. The State argued that this sixty-day-limit was necessary to "reinforce its disclosure regulations" and ensure that the public had sufficient time to learn about the contributors.[18] *Id.* However, the Fifth Circuit concluded that the State failed to demonstrate proper tailoring of its law. *Id.* If Texas was concerned "that its existing disclosure laws contain loopholes that may be exploited, Texas could address those loopholes by strengthening its disclosure requirements—such as by expanding mandatory electronic or fax filing requirements for disclosures—rather than by instituting waiting periods on speech[.]" *Id.* at 429. Notably, the Court explained that it was required to evaluate the necessity of a sixty-day period "based on present circumstances – not the circumstances when the restrictions were originally passed into law." *Id.* The Court explained that "[r]ecent campaign finance decisions by the Supreme Court have emphasized the role that advancing technology plays in enabling effective and quick disclosure of campaign finance activity." *Id.* With the advent of the Internet, massive quantities of information can be accessed at the click of a mouse, and disclosure is now effective to a degree not possible in the past. *Id.* The Court concluded that even if the sixty-day limit "was at some point sufficiently tailored, that is no longer true," as it now "strains credulity to suggest that it takes 60 days to inform the public as to who is spending money in electoral races." *Id.* Because of the "lack of a demonstrated need for a 60–day limit," the law was found to be "badly 'asymmetrical' to its interest in preventing *quid pro quo* corruption." *Id.*

In *Missourians for Fiscal Accountability v. Klahr*, 892 F.3d 944, 946 (8th Cir. 2018), the Eighth Circuit struck down a thirty-day formation deadline for campaign committees, which made it unlawful for a committee to form (and therefore make expenditures) within thirty days of an election. The Eighth Circuit recognized the importance of the thirty-day period preceding an election, as individuals and groups do not always know in advance that they will eventually want to speak about an election. *Id.* at 952. Still, the State argued that the thirty-day formation deadline was important because it was related to statements of organization filed by committees twenty days after formation, which, in conjunction with the thirty-day formation deadline, would result in statements being filed ten days before the election. *Id.* However, the Court found that other existing disclosure requirements undercut the necessity of the thirty-day formation deadline and its resulting ten-day statement filing. All active committees had to file

---

[18] As previously noted, the fact that the law was said to prevent circumvention of the disclosure regime did not mean that it could be reviewed under the lesser standard of scrutiny applicable to disclosure laws. *Catholic Leadership Coal. of Texas*, 764 F.3d. at 427. It was still a limit on contributions subject to the closely drawn test. *Id.*

statements of organization eight days before elections. *Id.* at 952-53. In addition, the State already had a statute requiring any campaign committees receiving a $5,000 donation from a single contributor to "electronically report" it within 48 hours regardless of when it was received. *Id.* Thus, the thirty-day formation deadline was not sufficiently tailored "[d]ue to its burden on speech and its modest effect on preventing circumvention of the disclosure regime." *Id.*

In *Family PAC v. McKenna*, 685 F.3d 800, 803 (9th Cir. 2012), the Ninth Circuit considered a ban on contributions exceeding $5,000 within twenty-one days of an election and found that it did not survive closely drawn scrutiny. The State argued that the twenty-one-day period was tied to its deadline for mailing ballots to voters eighteen days before the election. *Id.* at 812. The State asserted that all voters should have the necessary information about large contributions by the time they cast their votes, and this interest could not be adequately protected unless large contributors made themselves known twenty-one days in advance of the election. *Id.* The Ninth Circuit rejected this justification, emphasizing that the law imposed a significant burden on protected First Amendment rights by "limit[ing] contributions during the critical three-week period before the election, when political committees may want to respond to developing events." *Id.* Even though some voters may vote early and lack the benefit of all the relevant information, the Court found that the State's interest in informing those voters was outweighed by countervailing interests, including the right of individuals to contribute funds. *Id.* The Court found that "campaign contributions can be reported and made publicly available within minutes, and certainly within 24 hours." *Id.* at 813. In fact, the Court noted that Washington already had in place a system requiring disclosure of large contributions within 24 or 48 hours of receipt, even during the twenty-one days preceding the election. *Id.* Thus, the twenty-one-day limit was not closely drawn because it was "not reasonably necessary to inform voters about large contributions." *Id.* The Court cautioned that a narrower restriction might not suffer from the same constitutional infirmity "if limited to a time more carefully calculated to reflect the current time necessary to gather and organize and disseminate the relevant information about contributions and contributors that the government legitimately seeks to convey." *Id.* at 814. However, it also noted that "[i]n decisions upholding temporal restrictions on otherwise protected political activities, the restrictions at issue generally did not apply to the period immediately preceding the election." *Id.* at 812 n.13.

Finally, in *Worley v. Detzner*, No. 4:10CV423-RH/CAS, 2012 WL 12897964, at *1 (N.D. Fla. July 2, 2012), *aff'd sub nom. Worley v. Fla. Sec'y of State*, 717 F.3d 1238 (11th Cir. 2013), a district court considered a prohibition on spending any contributions received in the last five days before an election. The State argued that this limitation was "timed to coincide with the requirement for disclosing contributions" because the last required disclosure was five days before the election. *Id.* at *6. The State suggested that it needed to ban spending funds received after that last disclosure date because otherwise a contributor could "pour money into the campaign" at the last minute "without anyone

knowing until after the election." *Id.* Nevertheless, the district court deemed the ban unconstitutional, recognizing that "the last five days before the election [had been] perhaps the most crucial in many election cycles." *Id.* The court noted that even if the last disclosure report was due five days before the election, a supplemental disclosure could be filed during the last five days. *Id.* If such a disclosure was filed, the court found no adequate justification for preventing the spending of that money before the election. *Id.* The Court concluded by stating, "In the days of electronic filing and internet access to public records, any assertion that a five-day lag time is needed to provide meaningful public access has too little weight to justify a ban on core First Amendment speech." *Id.*[19]

In Tennessee, our State's campaign finance disclosure scheme was amended in 2003 to require the Registry to develop "an Internet-based electronic filing process for use by all candidates for state public office and all political campaign committees that are required to file statements and reports with the registry of election finance." Tenn. Code Ann. § 2-10-211(1). In addition, the Registry was required to develop "a system that will forward a copy of any candidate's report that is filed electronically with the registry of election finance to the appropriate local county election commission." Tenn. Code Ann. § 2-10-211(4). Thus, the Registry now maintains an "Internet filing system." Tenn. Comp. R. & Regs. 0530-01-01-.05(1). In addition, similar to the Missouri and Washington requirements discussed above, Tennessee Code Annotated section 2-10-105 already requires prompt reporting of large contributions made during the final ten days of an election:

> (h)(1) During the period beginning at twelve o'clock (12:00) midnight of the tenth day prior to a primary, general, runoff or special election or a referendum and extending through twelve o'clock (12:00) midnight of such election or referendum day, each candidate or political campaign committee shall, by telegram, facsimile machine, hand delivery or overnight mail delivery, file a report with the registry of election finance or the county election commission, whichever is required by subsections (a) and (b), of:
>
> (A) The full name and address of each person from whom the candidate or

---

[19] On appeal, the State relies heavily on *Gable v. Patton*, 142 F.3d 940 (6th Cir. 1998), wherein the Sixth Circuit upheld a twenty-eight-day ban that prohibited all gubernatorial candidates from accepting contributions during the twenty-eight days before the election. However, *Gable* is clearly distinguishable because the ban was deemed an indispensable part of Kentucky's complex campaign finance public funding scheme. A 21-day contribution ban was similarly upheld in *N. Carolina Right To Life Comm. Fund For Indep. Political Expenditures v. Leake*, 524 F.3d 427, 440–41 (4th Cir. 2008), because it was "a key component of the state's public funding system." Those justifications are not present in this case. *See Family PAC v. McKenna*, 685 F.3d 800, 813 (9th Cir. 2012) (distinguishing *Gable* because the provision at issue was necessary to Kentucky's implementation of its public funding system).

committee has received and accepted a contribution, loan or transfer of funds during such period and the date of the receipt of each contribution in excess of the following amounts: a committee participating in the election of a candidate for any state public office, five thousand dollars ($5,000); or, a committee participating in the election of a candidate for any local public office, two thousand five hundred dollars ($2,500). . . . .

. . . .

(2) Each report required by subdivision (h)(1) shall be filed by the end of the next business day following the day on which the contribution to be reported is received.

Tenn. Code Ann. § 2-10-105(h)(1). The State has not demonstrated that this type of prompt disclosure, already permitted for other contributions during the final ten days, would not also suffice for contributions by nonpartisan multicandidate political campaign committees. Such disclosure could be promptly accomplished through Internet filing or reporting by email, telegram, fax, hand delivery, or overnight mail. "[D]isclosure often represents *a less restrictive alternative* to flat bans on certain types or quantities of speech." *McCutcheon*, 572 U.S. at 223 (emphasis added).

We conclude that Tennessee Code Annotated section 2-10-117 is poorly tailored to the governmental interest in preventing quid pro quo corruption or its appearance, and it impermissibly restricts the participation of multicandidate political campaign committees in the political process. "[W]hatever the State's evidentiary obligation may be," *Nixon*, 528 U.S. at 393, it was not met in this case. The State has failed to demonstrate how its ban on contributions advances its interest in preventing corruption or is closely drawn to avoid unnecessarily abridging First Amendment rights. The indiscriminate ban on all contributions by nonpartisan multicandidate political campaign committees "after the tenth day before an election" is simply disproportionate to the governmental interests asserted.

We recognize that aside from their arguments regarding the closely drawn test, TSEL and the amici curiae also argue on appeal that the "discriminatory" aspects of Tennessee Code Annotated section 2-10-117 should be reviewed using strict scrutiny. Although TSEL does not specifically frame its argument on appeal in terms of Equal Protection, it clarified before the trial court that its "First and Fourteenth Amendment" claims alleging speaker discrimination and discrimination based on political association "include" Equal Protection claims. As the Court of Appeals for the Sixth Circuit recently recognized, "several of [its] sister circuits express doubt as to whether *Austin* [Supreme Court precedent] demands strict scrutiny in cases involving equal protection challenges to

contribution limits."[20] *Schickel,* 925 F.3d at 877. For instance, the D.C. Circuit has applied closely drawn scrutiny to an equal protection challenge to a contribution ban, "rejecting the 'doctrinal gambit' that 'would require strict scrutiny notwithstanding the Supreme Court's determination that the 'closely drawn' standard is the appropriate one under the First Amendment.'" *Id.* (quoting *Wagner v. Fed. Election Comm'n,* 793 F.3d 1, 32 (D.C. Cir. 2015) (en banc)). The D.C. Circuit reasoned that on the occasions when the Supreme Court has applied strict scrutiny when examining equal protection challenges in the context of First Amendment rights, the First Amendment analysis itself required such scrutiny. *Id.* (citing *Wagner,* 793 F.3d at 32). After examining additional cases, the Sixth Circuit concluded by stating:

> As for this circuit, we've not yet considered the level of scrutiny to apply. From our review of other circuits' precedent, however, we agree that the best reading of *Austin,* especially considering the scope of its application, confines its holding to cases in which the First Amendment analysis itself requires strict scrutiny. *See Wagner,* 793 F.3d at 32. We have found no case where the Supreme Court applied strict scrutiny in examining an equal protection challenge when the First Amendment analysis itself did not require such scrutiny, *see id.,* and just as our sister circuits, we decline to be the first. Thus, we hold that closely drawn scrutiny, the tier of scrutiny applied to the First Amendment challenge, also applies to the equal protection challenge.

*Id.* at 878. *See also Riddle v. Hickenlooper,* 742 F.3d 922, 930 (10th Cir. 2014) (Gorsuch, J., concurring) ("I confess some uncertainty about the level of scrutiny the Supreme Court wishes us to apply to this contribution limit challenge" based on equal protection grounds.)

Because we have already held the statute unconstitutional under the closely drawn test, we do not find it necessary or advisable to delve into the additional arguments regarding whether the allegedly discriminatory aspects of the statute should be reviewed under strict scrutiny and whether they would survive such scrutiny. These issues are pretermitted. We now turn to the two issues raised on appeal by TSEL in its posture as appellee.

### D. The District Attorney General

In its complaint, TSEL named as defendants not only the Registry but also the Davidson County District Attorney General. TSEL asserted that violations of Tennessee Code Annotated section 2-10-117 and -121 are criminal offenses. *See* Tenn. Code Ann. § 2-19-102 ("A person commits a Class C misdemeanor if such person knowingly does any

---

[20] *See Austin v. Mich. Chamber of Commerce,* 494 U.S. 652 (1990).

act prohibited by this title[.]"); Tenn. Code Ann. § 2-10-207(7) ("Where the results of [the Registry's] investigation indicate a criminal act may have occurred, the registry shall refer the matter to the appropriate district attorney general for criminal prosecution.")  As such, TSEL requested a permanent injunction against both defendants enjoining enforcement of the statutes.

At the preliminary injunction stage, the State argued that chancery courts lack jurisdiction to enjoin a threatened criminal prosecution.  The trial court ordered the parties to submit additional briefing regarding whether the District Attorney General should be dismissed from the lawsuit.  In its pre-trial brief, TSEL argued that the District Attorney General either should not be dismissed or in the alternative should be dismissed only without prejudice pending a final judgment as to the constitutionality of the challenged statute.  TSEL relied on *Clinton Books, Inc. v. City of Memphis*, 197 S.W.3d 749, 753 (Tenn. 2006) ("[O]nce this Court has concluded that a criminal statute is unconstitutional, no controversies are required to be settled by a criminal court, and the equity court is not invading the criminal court's jurisdiction by issuing an injunction.")  The trial court's final order simply stated, "[T]he Defendant Davidson County District Attorney General is dismissed from this action without prejudice pending the conclusion of appellate review."  At the conclusion of the hearing, the trial judge noted that the action against the District Attorney General "could be re-filed if necessary" depending on the outcome of the appeal.

On appeal, TSEL asks this Court to remand with instructions for the trial court to extend its injunction, which already applies to the Registry, to the Davidson County District Attorney General's office.  We conclude that such relief is inappropriate at this stage.  In *Clinton Books*, the Tennessee Supreme Court addressed whether a chancery court has subject matter jurisdiction to issue a temporary injunction barring enforcement of a criminal statute.  The Court discussed "the general rule prohibiting state equity courts from enjoining enforcement of a criminal statute."  197 S.W.3d at 753.

> The long-standing rule in Tennessee is that state courts of equity lack jurisdiction to enjoin the enforcement of a criminal statute that is alleged to be unconstitutional.  *See, e.g., Alexander v. Elkins*, 132 Tenn. 663, 179 S.W. 310, 311 (1915); *J.W. Kelly & Co. v. Conner*, 122 Tenn. 339, 123 S.W. 622, 637 (1909).  A lawsuit seeking injunctive relief due to an allegedly invalid criminal statute asks the chancery court, rather than the court that will enforce the criminal law, to enjoin the officers of the state from prosecuting persons who are conducting a business made unlawful by a criminal statute until the chancery court can determine the statute's validity. *J.W. Kelly & Co.*, 123 S.W. at 631.  Permitting a court of equity to interfere with the administration of this state's criminal laws, which that court is without jurisdiction to enforce, would cause confusion in the preservation of peace and order and the enforcement of the State's general

police power. *Id.* at 637.

. . . .

. . . Courts of equity, however, may enjoin the enforcement of a criminal statute that *this Court* has adjudged unconstitutional. *Alexander*, 179 S.W. at 311; *also Planned Parenthood* [*of Middle Tenn. v. Sundquist*], 38 S.W.3d [1,] 15 [(Tenn. 2000)] (holding that with regard to the Tennessee Constitution, we are the court of last resort, subject to the qualification that we refrain from impinging upon the minimum level of protection established by the United States Supreme Court's interpretations of the federal constitution). Once we have concluded that a criminal statute is unconstitutional, a person is not subject to criminal prosecution for acts committed in violation of the statute. *Alexander*, 179 S.W. at 311-12. Therefore, once this Court has concluded that a criminal statute is unconstitutional, no controversies are required to be settled by a criminal court, and the equity court is not invading the criminal court's jurisdiction by issuing an injunction. *Id.*

*Id.* at 752-53 (emphasis added). On appeal, TSEL relies on the final paragraph quoted above to suggest that this Court can now extend the injunction to the District Attorney General.

The Tennessee Court of Appeals is not a limited court of equity, but neither is it a criminal court nor the court of last resort. Accordingly, *Clinton Books* does not clearly answer whether this Court can require the chancery court to enjoin a District Attorney General from pursuing a criminal prosecution, upon finding a statute unconstitutional on appeal, when the chancery court lacked jurisdiction to do so in the first instance.

We note that "the general rule prohibiting state equity courts from enjoining enforcement of a criminal statute," 197 S.W.3d at 753, is not strictly limited to chancery courts. In *Clinton Books*, the Supreme Court extended the same rule for courts of equity to the *circuit court* of Shelby County. *Id.* Even though most circuit courts have original jurisdiction over criminal offenses, the situation is different in Shelby County, where criminal courts are separate from circuit courts, and the circuit courts do not hear criminal matters. *Id.* As a result, the circuit court was acting as a court of equity, and "the general rule that courts of equity lack jurisdiction to enjoin enforcement of a criminal statute that is alleged to be unconstitutional equally applie[d] to the Shelby County Circuit Court under the circumstances of [that] case." *Id.* at 753-54. In another case, the Court of Criminal Appeals similarly held that a general sessions court exercising equity jurisdiction could not enjoin prosecution of a criminal case. *State v. Osborne*, 712 S.W.2d 488, 492 (Tenn. Crim. App. 1986).

In *Campbell v. Sundquist*, 926 S.W.2d 250, 266 (Tenn. Ct. App. 1996) *abrogated on other grounds by Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827 (Tenn. 2008), this

Court declared an act criminalizing homosexual conduct unconstitutional, but we declined to enter an injunction against its enforcement by the District Attorney General, stating, "It is clear that this Court may not enjoin pending or threatened prosecutions for the violation of the criminal laws of this State." *Id.* (citing *Erwin Billiard Parlor v. Buckner*, 156 Tenn. 278, 300 S.W. 565 (1927); *Lindsey v. Drane*, 154 Tenn. 458, 285 S.W. 705 (1926); *Brackner v. Estes*, 698 S.W.2d 637 (Tenn. App. 1985)). Likewise, when this Court considered the issues at the intermediate level in *Clinton Books*, we stated that "[u]nder Tennessee law, a civil court does not have authority to enjoin the enforcement of a criminal statute." *Clinton Books, Inc. v. City of Memphis*, No. W2003-01300-COA-R3-CV, 2004 WL 2492279, at *4 (Tenn. Ct. App. Nov. 3, 2004) *aff'd* 197 S.W.3d 749 (Tenn. 2006). We described this as "the long-standing established law concerning a civil court's enjoining prosecution under criminal law." *Id.*

Finally, we find some guidance in *Erwin Billiard Parlor v. Buckner*, 300 S.W. 565 (Tenn. 1927), where suit was filed in chancery court against a District Attorney General and sheriff seeking a declaratory judgment that a statute was unconstitutional in addition to an injunction restraining the defendants from proceeding in the criminal court against the petitioners. The Supreme Court held that the trial court had jurisdiction to consider the declaratory judgment action. *Id.* at 566. However, the Court explained:

> This jurisdiction of the chancery court does not, however, include the power to issue an injunction against officers of the state or county charged with the enforcement of penal laws. And pending such a proceeding for a determination as to the construction or constitutionality of a penal statute, such officers may proceed in the discharge of the duties of their office without hindrance.

*Id.* (citation omitted). Accordingly, "[t]he chancellor was correct in declining to issue an injunction against the defendants." *Id.* But more importantly, on appeal, the Supreme Court held that a decree would be entered holding the act unconstitutional and void, "but the injunctive relief sought will be denied." *Id.*

Likewise, in *J.W. Kelly & Co. v. Conner*, 123 S.W. 622 (Tenn. 1909), petitioners filed suit in chancery court for the purpose of enjoining the District Attorney General and sheriff from instituting and prosecuting criminal actions against them on the basis that the relevant statutes were unconstitutional. On appeal, the Supreme Court found it "well established" that "the chancery court has no jurisdiction to enjoin pending or threatened prosecutions for violation of the criminal laws of the state." *Id.* at 627. Notably, because the chancery court lacked authority to act, the Supreme Court did not do so on appeal either. Instead, it added, "This conclusion disposes of the case. The chancery court having no jurisdiction to entertain and determine the case upon the merits, this court cannot do so; and we do not decide anything in regard to the merits or other questions than the one just disposed of. The only decree we can and will pronounce is one of

dismissal and adjudging costs." *Id.* at 637.

Considering these authorities, we agree with the chancery court's implicit conclusion that it lacked jurisdiction to enjoin the District Attorney General, and we will not extend the trial court's injunction to the District Attorney General on appeal.

### E.    Attorney's Fees

The final issue raised by TSEL is whether it should be awarded the attorney's fees it has incurred on appeal. The trial court granted TSEL's request for an award of attorney's fees incurred in the trial court pursuant to 42 U.S.C. § 1988(b) in the sum of $25,543.17. The trial court reasoned that TSEL was successful in securing civil rights relief as to the unconstitutionality of two statutes of statewide effect, triggering an award of attorney's fees pursuant to the statute.

On appeal, TSEL does not analyze 42 U.S.C. § 1988(b). In fact, its brief does not even mention that statute. With respect to its request for attorney's fees on appeal, its brief simply states:

> The Plaintiff is also entitled to an upward adjustment of its fee award with respect to this appeal, having expressly raised its entitlement to an appellate fee award in its Statement of the Issues and having advanced and defended meritorious constitutional claims in this appeal. *Cf. Killingsworth v. Ted Russell Ford, Inc.*, 205 S.W.3d 406, 410 (Tenn. 2006).

*Killingsworth* involved an award of attorney's fees pursuant to the Tennessee Consumer Protection Act. Because TSEL has not cited any relevant authority on appeal to support its request for attorney's fees, we respectfully decline to award such fees on appeal.

### IV.    CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby affirmed in all respects and remanded for further proceedings. Costs of this appeal are taxed to the appellant, the Tennessee Bureau of Ethics and Campaign Finance, Registry of Election Finance, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE